RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 05a0133p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

ERIC SHARP, Representative of the Estate of Earle
Chadwick Sharp, deceased,

*Plaintiff-Appellant,*

*v.*

UNITED STATES OF AMERICA,

*Defendant-Appellee.*

No. 03-2516

---

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 01-73731—George C. Steeh, District Judge.

Argued: March 10, 2005

Decided and Filed: March 16, 2005

Before: KENNEDY, MOORE, and SUTTON, Circuit Judges.

---

## COUNSEL

---

**ARGUED:** Dondi R. Vesprini, LAWRENCE S. KATKOWSKY ASSOC., Bingham Farms, Michigan, for Appellant. Geneva S. Halliday, ASSISTANT UNITED STATES ATTORNEY, Detroit, Michigan, for Appellee. **ON BRIEF:** Lawrence S. Katkowsky, LAWRENCE S. KATKOWSKY ASSOC., Bingham Farms, Michigan, for Appellant. Geneva S. Halliday, ASSISTANT UNITED STATES ATTORNEY, Detroit, Michigan, for Appellee.

---

## OPINION

---

KAREN NELSON MOORE, Circuit Judge. Eric Sharp appeals from an order of the district court dismissing his Federal Tort Claims Act ("FTCA") suit arising out of the death of his brother, Earle Chadwick Sharp ("Chad Sharp"), in an off-road-vehicle ("ORV") accident at the Huron National Forest. For the reasons set forth below, we **AFFIRM** the district court's dismissal of this action for lack of subject matter jurisdiction.

1

## I.  FACTUAL AND PROCEDURAL HISTORY

The Huron National Forest covers over 400,000 acres of northeast Michigan.  Included in the Huron National Forest is a forty-acre parcel known as the Bull Gap Hill Climb Area ("Bull Gap"), which has a large sand dune and over one hundred miles of trails.  In the late 1990s, the Bull Gap area became quite popular with ORV enthusiasts, and on holidays such as Memorial Day and the Fourth of July, over one thousand ORV riders and spectators would visit Bull Gap.

In 1999, only two National Forest Service law-enforcement officers were assigned to patrol the entire Huron National Forest.  In anticipation of a large Memorial-Day-weekend crowd at Bull Gap, a Law Enforcement Operating Plan for Bull Gap ("Bull Gap Operating Plan") was developed by one of Huron National Forest's law-enforcement officers, Officer Dallas Marroquin ("Officer Marroquin").  The Bull Gap Operating Plan, which was approved by Officer Marroquin's supervisor, Thomas Barton, provided for other local law-enforcement units, such as the Michigan State Police, the Michigan Department of Natural Resources, and the Oscoda County Sheriff's Department, to assist in patrolling Bull Gap during the Memorial Day weekend.

Among the Memorial-Day-weekend visitors to Bull Gap were Chad Sharp and his brother, Eric Sharp.  At approximately 9:50 p.m. on Sunday evening, the ORV Chap Sharp was riding up the Bull Gap sand dune stalled.  Chad jumped off the ORV, but for reasons unknown, returned to the vehicle just as a pickup truck began racing up the dune.  Chad was struck by the pickup truck and later died of his injuries.

Eric Sharp, as representative of Chad Sharp's estate, filed the instant suit against the United States (the "Government") under the FTCA, alleging gross negligence and/or willful and wanton misconduct by the National Forest Service.  More specifically, Sharp's suit contends that the National Forest Service is liable for:  (1) allowing ORVs to operate in the Bull Gap area twenty-four hours a day without furnishing adequate lighting, and (2) failing to maintain an adequate law-enforcement presence in Bull Gap.  A bench trial was held, and after hearing the testimony of several witnesses, the district court granted the Government's Rule 52(c) motion for judgment on partial findings.  In its oral ruling, the district court explained that Sharp had not shown the inapplicability of the discretionary-function exception to the FTCA and thus had failed to establish federal subject matter jurisdiction over the suit.  Sharp now appeals to this court.

## II.  ANALYSIS

### A.  Standard of Review

The district court below dismissed the instant suit pursuant to Federal Rule of Civil Procedure 52(c), which provides in part that:

> [i]f during a trial without a jury a party has been fully heard on an issue and the court finds against the party on that issue, the court may enter judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue. . . .

When entering judgment pursuant to Rule 52(c), the district court must set forth particular findings of fact, which we then review for clear error.  *See* FED. R. CIV. P. 52(c) 1991 advisory committee note.  We review de novo, however, the district court's legal determination that it lacked subject matter jurisdiction over this action.  *See Rich v. United States*, 119 F.3d 447, 449 (6th Cir. 1997), *cert. denied*, 523 U.S. 1047 (1998).

## B.  Discretionary-Function Exception to the FTCA

Before a suit may be maintained against the United States, the United States must consent to being sued.  *Montez v. United States*, 359 F.3d 392, 395 (6th Cir. 2004) (citing *United States v. Orleans*, 425 U.S. 807, 814 (1976)).  Through its enactment of the FTCA, Congress has waived the United States's immunity from suits:

> for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1).  This waiver of sovereign immunity is subject to a number of limitations, including the discretionary-function exception codified in 28 U.S.C. § 2680(a).  *See* 28 U.S.C. § 2680(a) (stating that 28 U.S.C. § 1346(b)'s waiver of sovereign immunity does not apply to "[a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused").  If the discretionary-function exception applies and Congress has not otherwise waived the United States's immunity, then we lack subject matter jurisdiction over the action.  *See Rich*, 119 F.3d at 450.

When determining whether the United States is immune from suit based on the discretionary-function exception, we engage in a two-step analysis.  We first consider "whether the challenged act or omission violated a mandatory regulation or policy that allowed no judgment or choice.  If so, the discretionary function exception does not apply" because "the employee had no rightful option but to adhere to the directive" and thus "there was no element of judgment or choice in the complained of conduct."  *Rosebush v. United States*, 119 F.3d 438, 441 (6th Cir. 1997) (internal quotation marks and citations omitted).

If the challenged action is deemed discretionary, we proceed to step two of the analysis, in which we determine "whether the conduct is 'of the kind that the discretionary function exception was designed to shield.'"  *Id.* (quoting *United States v. Gaubert*, 499 U.S. 315, 322-23 (1991)).  In undertaking such an evaluation, we keep in mind that "the discretionary function exception was designed to prevent" courts from being required "to 'second guess' the political, social, and economic judgments of an agency exercising its regulatory function."  *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 820 (1984).  Such judgments are not restricted to those made by an agency's policymakers, for "it is the nature of the conduct, rather than the status of the actor, that governs whether the discretionary function exception applies in a given case."  *Id.* at 813; *see Gaubert*, 499 U.S. at 325 (concluding that day-to-day management of savings and loan by federal regulators fell within scope of discretionary-function exception, explaining that, "A discretionary act is one that involves choice or judgment; there is nothing in that description that refers exclusively to policymaking or planning functions.").  We also consider the fact that "[w]hen established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion."  *Gaubert*, 499 U.S. at 324.[1]

---

[1]We note that there appears to be some debate as to the impact of this so-called *Gaubert* presumption on the question of which party bears the burden of proving the applicability (or inapplicability) of the discretionary-function exception.  In *Carlyle v. United States, Department of the Army*, a case decided before the Supreme Court issued its ruling in *Gaubert,* we explained:

> Because § 2680 clearly limits the jurisdiction of the federal courts, a plaintiff can invoke jurisdiction only if the complaint is facially outside the exceptions of § 2680. . . . Only after a plaintiff has

### 1. Hours of Operation/Lighting Conditions

Sharp's first theory of liability is that the National Forest Service acted negligently in allowing Bull Gap to remain open during nighttime hours without providing better lighting conditions. According to Sharp, the National Forest Service's decisions regarding Bull Gap's hours of operation and lighting conditions do not come within the reach of the discretionary-function exception to the FTCA because the Forest Service Manual mandates the protection of visitors' health and safety, and the National Forest Service acted negligently in effectuating this policy.

At the heart of this claim is Title 6700 of the Forest Service Manual, which provides in part:

6702 - OBJECTIVE. The objective of the Forest Service safety and health program is to ensure adequate protection for Forest Service employees and property, Human Resource Program participants, and the visiting public. . . .

6703 - POLICY

* * *

> 2.  Safety and health of all involved individuals are the highest priorities on any job.

> 3.  The Forest Service shall provide safe and healthful facilities for visitors.

Pl.-Appellant's Br. at 7. Sharp asserts that, while the National Forest Service's issuance of these policies amounts to a discretionary act encompassed by the discretionary-function exception, the National Forest Service's decisions regarding hours of operation and lighting conditions are not similarly protected. We disagree.

As the district court correctly noted, Title 6700 of the Forest Service Manual contains "[v]ery broad statements" that "certainly could not be read" as eliminating the National Forest Service's discretion in determining how best to carry out such policies. Joint Appendix ("J.A.") at 32 (Trial Tr. Vol. II at 161). Title 6700 does not set forth specific regulations dictating a national forest's hours of operation or lighting conditions and thus is not "a mandatory regulation or policy that allowed no judgment or choice." *Rosebush*, 119 F.3d at 441. Hence, the district court correctly classified the National Forest Service's decisions to allow twenty-four-hour public access to the Huron National Forest and to not install additional lighting facilities at Bull Gap as discretionary acts.

---

successfully invoked jurisdiction by a pleading that facially alleges matters not excepted by § 2680 does the burden fall on the government to prove the applicability of a specific provision of § 2680. Any other reading of 28 U.S.C. § 1346(b) and § 2680 would conflict with the general rule that a party invoking federal jurisdiction must allege facts necessary to establish subject matter jurisdiction.

674 F.2d 554, 556 (6th Cir. 1982) (citations omitted). The Ninth Circuit, in a post-*Gaubert* decision, expressly adopted our method of resolving burden-of-proof issues, finding it consistent with the *Gaubert* presumption. *See Prescott v. United States*, 973 F.2d 696, 702 & n.4 (9th Cir. 1992) ("The framework that the Seventh [sic] Circuit articulated in *Carlyle* and that we adopt here is consistent with the [*Gaubert*] Court's analysis. *Gaubert*, of course, did not deal with the burden of proof question.") (citation omitted). Other circuits considering burdens of proof in discretionary-function cases after *Gaubert* have declined to adopt the *Prescott* court's analysis, instead leaving the issue unresolved. *See Autery v. United States*, 992 F.2d 1523, 1526 n.6 (11th Cir. 1993); *Kiehn v. United States*, 984 F.2d 1100, 1105 n.7 (10th Cir. 1993) (noting that the Ninth Circuit's reasoning in *Prescott* "may be suspect in light of *Gaubert*," but finding it unnecessary to decide the issue). Because we conclude that the discretionary-function exception applies in this case even if the Government bears the burden of proof, we need not settle this issue here.

The district court also correctly determined that these decisions were "'of the kind that the discretionary function exception was designed to shield.'" *Id.* (quoting *Gaubert*, 499 U.S. at 322-23). As the Government noted, the National Forest Service, in setting the hours-of-operation and lighting policies for the Huron National Forest, was not required to take account of only Title 6700's statements regarding health and safety. Rather, the National Forest Service also had to consider § 2303 of the Forest Service Manual, which directs the National Forest Service to "[e]nhance[] recreation exp[]eriences through a minimum of regulation and law enforcement." J.A. at 67 (Trial Tr. Vol. II at 49). It is "[t]his *balancing* of interests . . . [that] characterizes the type of discretion that the discretionary function exception was intended to protect." *Myers v. United States*, 17 F.3d 890, 898 (6th Cir. 1994).

Indeed, we have previously recognized the applicability of the discretionary-function exception in cases challenging similar National Forest Service determinations. For instance, in *Reetz v. United States*, 224 F.3d 794, 797 (6th Cir. 2000), we concluded that the discretionary-function exception applied to a suit brought by an ORV operator who had been injured while driving on a service road that the National Forest Service had not marked as closed to ORV traffic. In so ruling, we explained that "[d]ecisions protected from tort liability by the discretionary function exception to the FTCA include: 1) the proper response to hazards; 2) how to make federal lands safe for visitors; and 3) whether to warn of potential dangers." *Id.*; *see also Rosebush*, 119 F.3d at 443 (ruling that discretionary-function exception encompassed failure to place protective grating and guard rails around fire pit and failure to warn visitors of fire-pit dangers). Because the National Forest Service's decisions regarding the Huron National Forest's hours of operation and lighting conditions required the National Forest Service to make policy-type judgments balancing several competing considerations, we conclude that the district court did not err in applying the discretionary-function exception and dismissing this claim for lack of subject matter jurisdiction.

## 2. Law-Enforcement Presence

The second theory of liability asserted in Sharp's suit is that the National Forest Service acted negligently in providing inadequate law-enforcement services at Bull Gap. Sharp contends that the district court erred in dismissing this claim based on the discretionary-function exception because National Forest Service law-enforcement officers did not comply with the mandatory terms of the Bull Gap Operating Plan in effect at the time of Chad Sharp's accident. We conclude that Sharp's argument affords him no relief.

As Sharp correctly asserts, if the Bull Gap Operating Plan were deemed to be "a mandatory regulation or policy that allowed no judgment or choice," and if it were determined that the National Forest Service violated the terms of the Bull Gap Operating Plan, the actions at issue would not be discretionary and the discretionary-function exception to the FTCA would not apply. *Rosebush*, 119 F.3d at 441. We conclude, however, that neither of these conditions is satisfied. First, the circumstances surrounding the preparation of the Bull Gap Operating Plan indicate that the plan was not designed to be a mandatory National Forest Service policy. As the district court correctly observed, although the Bull Gap Operating Plan states that the National Forest Service "will" use officers from other local law-enforcement agencies in patrolling Bull Gap, this provision could not be deemed mandatory because the National Forest Service did not have the ability to compel the participation of other law-enforcement-agency personnel or to even guarantee its own staffing levels. The non-mandatory nature of the Bull Gap Operating Plan is further confirmed by the testimony of Dwight Devereux, an assistant ranger for the Huron National Forest. When questioned about the Bull Gap Operating Plan, Devereux stated that it was "not a policy," but rather was merely "designed to guide [their] activities that [Memorial Day] weekend." J.A. at 80 (Trial Tr. Vol. II. at 118). Devereux further explained that there was no "requirement or mandat[e] that the Forest Service actually follow [the Bull Gap Operating P]lan" because "there's [sic] always circumstances that require deviations from plans." J.A. at 80 (Trial Tr. Vol. II at 118); J.A. at 84 (Trial Tr. Vol.

II at 135) ("I can testify that this is an operating plan and I have some experience with previous operating plans and I don't be [sic] in any case that operating plans are followed to the exact T."). Hence, we conclude that the Bull Gap Operating Plan did not constitute a mandatory policy dictating the National Forest Service's law-enforcement operations during the 1999 Memorial Day weekend.

We also note that, even if the Bull Gap Operating Plan were deemed a mandatory policy, it does not appear that the National Forest Service violated the plan provisions. Based on the testimony of the witnesses at trial and the district court's findings,[2] it appears that the Bull Gap Operating Plan set forth a law-enforcement-officer staffing schedule that called for six officers to work a shift running from 11:00 a.m. to midnight. J.A. at 42 (Trial Tr. Vol. II at 5). Sharp asserts that the National Forest Service's law-enforcement officers did not abide by this work schedule because they left the Bull Gap area approximately one hour before Chad Sharp's accident, or roughly three hours before the end of the scheduled shift. The district court found, however, that "nothing in [the Bull Gap Operating P]lan required the staff to be present at the hill climb area," that the law-enforcement officers had returned to the control center to take care of administrative tasks, and that the officers' "plan was to patrol on the way home so that they would indeed arrive at a point to exit the Huron National Forest during their patrolling activities at or around midnight, not[]withstanding the fact they had indeed started earlier than this plan would call for." J.A. at 39 (Trial Tr. Vol. II at 168). As the district court noted, "Indeed, . . . if anything they were doing more than the plan called for by the schedule they were maintaining and they had not departed for home as of the time that this call reporting the accident was received." J.A. at 39-40 (Trial Tr. Vol. II at 168-69). The district court's findings are well-supported by the testimony at trial. As Officer Marroquin, who drafted the Bull Gap Operating Plan, explained, the shifts listed in the plan were designed to reflect the officers' entire working period, including the time required to return to their home districts, which appear to have been located more than an hour's drive from Bull Gap. J.A. at 93 (Trial Tr. Vol. II at 63) ("We have to give ourselves enough time to make it back to our home units, that's the only amount of time we were scheduled for, on the schedule."); J.A. at 104 (Trial Tr. Vol. II at 74) ("That was to be the total extent of [the officers'] shift time, and the officers knew that that were there. We all knew what that meant, it would give us time to get back to our home units instead of making it a 12 hour day there, if we would have tacked on an extra hour and a half each way it would make it an extremely long shift."). Indeed, the officers' pre-midnight departure from the Bull Gap area could be seen as required by the Bull Gap Operating Plan's provision that "[l]aw enforcement officers will work a schedule that best meets the needs of providing public safety and protecting property[/]resources," in that the officers were still responsible for patrolling their home areas during the Memorial Day weekend, notwithstanding their being scheduled to work at Bull Gap. J.A. at 90 (Trial Tr. Vol. II at 59); *see* J.A. at 106 (Trial Tr. Vol. II at 76) (acknowledgment by Officer Marroquin that he was "the only law enforcement officer assigned to the Huron shores portion of the Huron National Forest" and that "while [he was] assisting in the Bull Gap area Memorial Day weekend[, his] area did not have a law enforcement officer patrolling excep[t] for what [he] could do in the morning and late at night"). Thus, Sharp's argument that the discretionary-function exception does not apply because the National Forest Service violated a mandatory National Forest Service policy lacks merit.

We also conclude that the district court properly determined that the law-enforcement-staffing decisions by the National Forest Service are "'of the kind that the discretionary function exception was designed to shield.'" *Rosebush*, 119 F.3d at 441 (quoting *Gaubert*, 499 U.S. at 322-23). The National Forest Service's decisions regarding the number and assignment of law-enforcement officers are the product of assessing and balancing the needs of all parts of the Huron

---

[2]We note that our review in this case has been made rather difficult by the parties' failure to include a copy of the Bull Gap Operating Plan in the Joint Appendix or to preserve as part of the district court record the trial exhibit containing the plan.

National Forest (not simply the Bull Gap area), budgetary constraints, and the Forest Service Manual directive that "recreation experiences [be enhanced] through a minimum of regulation and law enforcement." J.A. at 67 (Trial Tr. Vol. II at 49); J.A. at 56-57 (Trial Tr. Vol. II at 35-36) (explaining that "we only had a limited amount of Forest Service law enforcement personnel. The heaviest use time is day time. Night time there's not much activity, so it's efficient to put our forces on during day time, during the busy times."); J.A. at 71 (Trial Tr. Vol. II at 77) (citing budgetary reasons for the fact that only two law-enforcement officers were permanently assigned to patrol the Huron National Forest); *see Carlyle v. United States, Dep't of the Army*, 674 F.2d 554, 557 (6th Cir. 1982) (applying discretionary-function exception in suit challenging Army's manner of supervising recruits, explaining that although "[t]he plaintiff's argument might be meritorious if the Army had in fact decided to place a supervisor in the Hotel only to have that person leave his post," "[a]ny decision to supervise [Army recruits] only by means of letters and not to place personnel in the Hotel was a discretionary function and outside federal jurisdiction"); *see also Lockett v. United States*, 938 F.2d 630, 639 (6th Cir. 1991) (concluding that EPA's response to PCB spill fell within discretionary-function exception, explaining that "these discretionary decisions, based upon 'judgment calls' concerning the sufficiency of evidence of violations of applicable regulations, the allocation of limited agency resources, and determinations about priorities of serious threat to public health, are the very 'public policy' discretionary judgments Congress intended to shield from liability under section 2680(a)"); *Totten v. United States*, 806 F.2d 698, 701 (6th Cir. 1986) (extending discretionary-function exception to Air Force's decision as to how to clean up spilt rocket fuel, explaining that the operation "involved discretionary decisions based not only on safety but also on such considerations as budgetary and time constraints and the availability of personnel with expertise in solid fuel clean-up"). Thus, the district court properly determined that the discretionary-function exception to the FTCA applies and that it did not have subject matter jurisdiction over Sharp's suit.

## III.  CONCLUSION

For the reasons set forth above, we agree with the district court's determination that the discretionary-function exception to the FTCA's waiver of sovereign immunity applies in this case, and we therefore **AFFIRM** the dismissal of this action for lack of subject matter jurisdiction.