NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 18a0211n.06

No. 17-2258

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED
Apr 24, 2018
DEBORAH S. HUNT, Clerk

| | |
|---|---|
| In re: MODERN PLASTICS CORPORATION, Debtor.　　　　　　　　) ) ) ) ) ) | |

In re: MODERN PLASTICS
CORPORATION,

    Debtor.

_____

NEW PRODUCTS CORPORATION,

    Appellant,

v.

THOMAS R. TIBBLE, individually and in his
capacity as Chapter 7 Trustee; FEDERAL
INSURANCE COMPANY,

    Appellees.

_____/

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

On Appeal from the United States
District Court for the Western District
of Michigan

**Before: GUY, SUTTON, and COOK, Circuit Judges.**

**RALPH B. GUY, JR., Circuit Judge.** New Products Corporation (NPC) appeals the

dismissal of claims it brought against former Chapter 7 Trustee Thomas Tibble and his surety

Federal Insurance Company. NPC, an unhappy creditor, alleged that the Trustee breached his

fiduciary duties in handling one of the Debtor's assets—namely, real property on which sat a

former manufacturing facility that was methodically stripped by scrappers and allowed to

deteriorate while it was part of the bankruptcy estate. NPC argues, as it did before the district

court, that the bankruptcy judge erred in narrowing its claims on motions for summary judgment,

denying reconsideration, and ordering a bifurcated trial on NPC's secured creditor claims to

determine the central factual question of whether there was equity in the Property. (Orders dated

12-14-14, 7-23-15, 8-26-15, and 10-15-15.) NPC contends that the bankruptcy judge erred in

granting defendants' mid-trial motion for judgment on partial findings under Fed. R. Civ. P.

52(c) (Fed. Bankr. R. P. 7052), and denying NPC's motion for new trial or to alter or amend

judgment under Fed. R. Civ. P. 59 (Fed. Bankr. R. P. 9023). (Orders dated 1-21-16, 3-14-16.)

The district court affirmed the bankruptcy court in all respects. *See New Prods. Corp. v. Tibble,*

*et al. (In re Modern Plastics Corp.)*, 577 B.R. 270 (W.D. Mich. 2017). After careful

consideration of the issues presented on appeal, the district court's order affirming the

bankruptcy court's judgment on the merits is affirmed.

## I.[1]

The Debtor Modern Plastics Corporation's assets included approximately 12 acres of real

property commonly known as 489 North Shore Drive, Benton Harbor, Michigan (Property). The

Property, located directly across the street from NPC and adjacent to a relatively new golf course

development, included "a main building, initially constructed in 1936, [that] consisted of

approximately 127,000 square feet [that was] at one time used for manufacturing, office, and

related purposes." *New Prods. Corp. v. Tibble, et al. (In re Modern Plastics Corp.)*, 543 B.R.

819, 826 (Bankr. W.D. Mich. 2016) ("Findings of Fact and Conclusions of Law After Trial").

The Property was part of the collateral that the Debtor pledged to secure its pre-petition loans

from Bank of America (BOA), on which the Debtor owed $1,275,912.01 when the bankruptcy

petition was filed on January 26, 2009. *Id*. at 825-26.

---

[1]The lengthy procedural history and the evidence before the bankruptcy judge will not be detailed here, and familiarity with all six of the bankruptcy court's orders relating to this appeal is assumed.

Financial difficulties left the Debtor unable to meet its obligations to BOA, state and local taxing authorities, and other creditors (including NPC). *Id*. at 826. The Debtor ceased operations in July 2008, and conducted a pre-petition equipment auction at the behest of BOA in October 2008. Although the condition of the building was contested, the bankruptcy judge found after the bifurcated trial that leaks in the roof resulted in "pools of standing water within the building" that were visible during the pre-petition equipment auction. *Id*. Also, the Trustee's "credible testimony established that the Property was in a deplorable and unsafe condition" when he made his one and only inspection in January 2009. *Id*.

The Property was listed for sale pre-petition and, with the consent of BOA, the Debtor entered into an agreement on December 26, 2008, to sell the Property to Ox Creek Development, LLC (an entity associated with the golf course) for $650,000. *Id*. at 825-26. Once in bankruptcy, and again with the consent of BOA, the Trustee tried unsuccessfully to sell the Property to Ox Creek for between $650,000 and $590,000—after negotiating an agreed carve-out for the bankruptcy estate. *Id.* at 826-27. When that sale did not close, the Trustee negotiated an option agreement extending Ox Creek's right to purchase the Property for another four months. *Id*. at 827. Although the option was not exercised, the Trustee received the option payments without objection from BOA. *Id*. at 825.[2]

The Trustee obtained casualty insurance on the Property for a year and a half, but cancelled the insurance in November 2010 after BOA advised that it would not pay the premium or put any more money in the Property. (Page ID # 5509.) The Trustee later leased the parking lot for an event at the golf course and retained the income for the estate without objection from BOA. *Id*. In fact, the bankruptcy judge found that BOA had acquiesced in the Trustee's

---

[2]Not long after the bankruptcy filing, contamination from a leaking transformer was discovered and the EPA subsequently incurred removal and cleanup costs in excess of $600,000.

handling of the Property for more than four years—never objecting, requesting adequate protection, moving for relief from the stay, or seeking to compel the Trustee to abandon the Property. *Id*. at 821. BOA's representative testified that the bank did not want to foreclose on the Property (Page ID # 5488), which effectively "ke[pt] the bank out of the chain of title of a potentially contaminated industrial site." *Id*. at 827.[3]

NPC is a "Tier 1" automotive supplier "founded by the same man who established the Debtor and still managed by the founder's granddaughter [Cheryl Miller]." *Id*. at 820. NPC was an unsecured creditor when the Debtor filed for bankruptcy, and only later became a secured creditor when NPC "acquired BOA's rights against the Debtor and the Property under a post-petition assignment of the bank's loan documents" on March 4, 2013. *Id*. NPC acquired those rights for $225,000 as the high bidder in an auction of BOA's promissory notes, mortgages, and other loan documents (after beating out another entity associated with the golf course). *Id*. at 826. Miller testified that she saw this as an opportunity to acquire the Property, intending to use the building to expand NPC's operations, create a "buffer" between NPC and the golf course, and possibly subdivide and sell some of the lots.

Miller testified that she was shocked to discover after the assignment that the interior of the Debtor's facility had been systematically stripped by scrappers and the roof had failed in two places. Two witnesses testified to having participated in organized scrapping activities during late 2010 and into 2011; one of whom testified that he was paid to work at the site five days a week, eight hours a day, for seven months removing truckloads of material. *New Prods.*, 543 B.R. at 828. Two notices of condemnation were sent to the Debtor in 2011, allowing an opportunity to bring the structure up to code but suggesting that the Debtor consider demolition

---

[3]There was evidence that BOA drafted a motion to lift the stay but never filed it. (Page ID # 4556-65.)

as an alternative. *Id.* Miller testified that she had not been inside the building between the bankruptcy filing and the assignment. The bankruptcy judge found it difficult to believe Miller could have been unaware of the scrapping activities since she worked across the street during this period. *Id.* at 829. More importantly, however, the bankruptcy judge explained that he did not believe Miller—a sophisticated businessperson running a Tier 1 global automotive supplier—would have authorized the purchase of the debt without inspecting the interior "unless the condition of the building was immaterial to the decision." *Id.*

Not long after the assignment, the Trustee filed a motion for approval of his final report giving notice of the proposed distributions and the resulting abandonment of all remaining estate property pursuant to 11 U.S.C. § 554(c). *Id.* NPC opposed that motion and, in September 2013, filed this action seeking damages for diminution in value of the Property resulting from the Trustee's alleged breach of fiduciary duties owed to the estate, BOA, and NPC. *Id.* at 820-21. NPC maintained, among other things, that the Trustee failed to protect the Property against vandals and scrappers who stripped the building over time of its "copper wires, steel beams, piping, 'bus ducts,' lighting fixtures, furnaces, [and] even support beams." *Id.* at 820. NPC documented further deterioration and additional scrapping activity in the post-assignment/pre-abandonment period, but did not file any motions for relief from the stay, for adequate protection, or to compel abandonment. *Id.* Ultimately, the Trustee's final report was approved and the Property abandoned in January 2014. *Id.* When the bankruptcy judge suggested that the appointment of an independent trustee might be warranted, Tibble resigned and a successor trustee was appointed in January 2015.

The bankruptcy judge narrowed NPC's claims in several ways that are challenged on appeal, including: (1) ruling that NPC could not pursue a claim on behalf of the unsecured

creditors (*i.e.*, the estate) after appointment of the successor trustee; (2) concluding that NPC could not recover damages for the cancellation of casualty insurance where NPC's predecessor-in-interest had acquiesced in that decision; and (3) holding that NPC had "purchased only BOA's contract rights against the Debtor but not any of the tort claims BOA may have had against the Trustee (including claims that BOA may have been able to assert for pre-assignment breaches of fiduciary duty)." *Id.* at 821. Together, those rulings meant that NPC could recover only as a secured creditor and only for "diminution of the Property's value that occurred between the March 4, 2013 Assignment Date, and January 6, 2014 (the date that the Trustee technically abandoned the property)." *Id.* The bankruptcy court denied three new cross-motions for summary judgment, finding that disputed questions of valuation and equity were central to determining "whether Mr. Tibble breached his fiduciary duty or whether his actions were reasonable under the circumstances." This prompted the bankruptcy judge to order a bifurcated trial to determine the value of the Property and extent of the encumbrances against it, and clarifying that evidence regarding the value pre- and post-assignment would be considered.

At trial, the bankruptcy judge heard two days of testimony, received two important depositions, and admitted an extensive number of exhibits into evidence. After NPC completed its proofs, defendants moved for entry of judgment in their favor under Rule 52(c). The bankruptcy judge issued written findings of fact and conclusions of law, and denied NPC's motion for new trial or to alter or amend judgment. The district court examined NPC's claims of error and affirmed in all respects. This appeal followed.

## II.

In this appeal, the bankruptcy court's orders are reviewed directly rather than the intermediate decision of the district court. *Lowenbraun v. Canary (In re Lowenbraun)*, 453 F.3d

314, 319 (6th Cir. 2006). We review the bankruptcy court's legal conclusions *de novo*, and its factual findings for clear error. *Id.*; *Zingale v. Rabin*, 693 F.3d 704, 707 (6th Cir. 2012). Decisions regarding the admission of evidence are reviewed for abuse of discretion. *Conwood Co., LP v. U.S. Tobacco Co.*, 290 F.3d 768, 781 (6th Cir. 2002).

### A.      Breach of Fiduciary Duty

NPC argues that the bankruptcy court erred in concluding that a trustee owes no duty to protect or insure property that is retained in the bankruptcy estate if that property is fully encumbered. This characterization misstates, or at least overstates, the bankruptcy court's actual rulings recognizing the Trustee's competing duties to secured and unsecured creditors. The bankruptcy court's judgment did not rest on a finding that there was no duty, but rather determination that the Trustee had not breached his duties to BOA or NPC with respect to the Property under the circumstances. We find no error of law.

The bankruptcy court recognized that a Chapter 7 Trustee "primarily represents the unsecured creditors, and represents the secured creditors only in his capacity as a custodian of the property upon which they have a lien." *Ford Motor Credit Co. v. Weaver*, 680 F.2d 451, 462 n.8 (6th Cir. 1982) (quoting *The Second Nat'l Bank of Nazareth v. Marcincin (In re Nadler)*, 8 B.R. 330, 333 (Bankr. E.D. Pa. 1980)). The trustee's duty to "account for all property received," 11 U.S.C. § 704(a)(2), does not impose an unqualified duty to protect or manage assets for the benefit of secured creditors at the expense of the estate. *United States ex rel. The Peoples Banking Co. v. Derryberry (In re Peckinpaugh)*, 50 B.R. 865, 869 (Bankr. N.D. Ohio 1985); *see also Fox v. Anderson (In re Thu Viet Dinh)*, 80 B.R. 819, 823 (Bankr. S.D. Miss. 1987) ("The trustee must also exercise reasonable diligence to conserve the assets of the bankruptcy estate, but he is not relegated to the role of a 'babysitter' for the secured creditors.").

Rather, "[t]he measure of care, diligence and skill required of a bankruptcy trustee is that of an ordinary prudent man in the conduct of his private affairs under similar circumstances and of a similar object in view." *Reich v. Burke (In re Reich)*, 54 B.R. 995, 998 (Bankr. E.D. Mich. 1985); *see also Central Savings Bank v. Lasich (In re Kinross Mfg. Corp.)*, 174 B.R. 702, 706 (Bankr. W.D. Mich. 1994) (finding that whether a trustee breached his duty, including by not procuring insurance, "is bound inextricably" with the particular facts of the case). The bankruptcy court did not err in concluding that the value of and extent of the liens against the Property would be central to determining whether Tibble breached his fiduciary duties to the secured creditors under the circumstances.

The bankruptcy judge found the evidence overwhelmingly established that the Property was underwater. Specifically, after determining the total amount of the liens, the bankruptcy judge found that the liens exceeded the value of the Property by more than $950,000 on both the "Petition Date" and the "Assignment Date." *New Prods*., 543 B.R. at 830. In determining the value of the Property, the bankruptcy judge found, in part, that the pre-petition offer of $650,000 was an "exceedingly persuasive indicator of the Property's value as of the Petition Date," and that BOA's willingness to grant a carve-out and accept much less than its claim "sp[oke] volumes about the lender's dim view of the Property's value." *Id*. at 827. Further, evidence that "BOA was unwilling to spend any money to insure its collateral" supported "an inference of less, rather than more, value than the $650,000 it was willing to accept pre-petition." *Id*. Even more significantly, the bankruptcy judge also found that "it was the location of the Property, rather than the structures built upon it, that accounted for most of the value." *Id*. at 828. Evidence supporting that conclusion included: a pre-petition opinion that "the highest and best use for the Property was as a redevelopment site"; credible evidence that the vacant building was in poor

condition when the petition was filed; and the failure of BOA or NPC to pursue any of the protections for the building that were available to them as secured creditors. *Id*. at 828-29.

The bankruptcy court acknowledged the devastating effects of the post-petition scrapping as "shocking, if not revolting," but concluded that "BOA and the trustee agreed expressly or impliedly to neglect the building because it did not make economic sense to do otherwise." *Id*. at 832. Consequently, "[g]iven the complete absence of equity, and the relative unimportance of the building in the evaluation of the Property," the bankruptcy judge found that "Mr. Tibble behaved as 'an ordinary prudent man in the conduct of his private affairs under similar circumstances and with a similar object in view' would have behaved." *Id* (quoting *Weaver*, 680 F.2d at 461-62; *In re Kinross*, 174 B.R. at 705). NPC argues this was error for several reasons.

## B.    Judgment on Partial Findings

Rule 52(c) provides, in part, that: "If a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under controlling law, can be maintained or defeated only with a favorable finding on that issue." In entering judgment under Rule 52(c), the court must set forth specific findings of fact that are reviewed for clear error. *Sharp v. United States*, 401 F.3d 440, 442 (6th Cir. 2005). NPC argues that the bankruptcy court erred in granting judgment because some of the findings were not supported by the record, because testimony from NPC's expert witness was excluded, and because NPC did not have an opportunity to be "fully heard."[4]

---

[4]NPC also repeats its claim that the burden was improperly placed on NPC to disprove an affirmative defense. However, the bankruptcy court found that the evidence had so "overwhelmingly establish[ed] the absence of equity" that it was not necessary to identify which party bore the burden of proof with respect to the value proposition. 543 B.R. at 824 n.8.

*Findings*.  NPC argues that there was no evidence to support the finding that the Debtor had deferred maintenance or that there were roof leaks and places with standing water at the time the petition was filed.  As the district court observed, however, Ronald Miller testified that he was hired to evaluate Modern Plastics in 2008; that the "roof was leaking in multiple places, probably [because] there was a lot of deferred maintenance"; and that it "didn't appear as though the company had been investing in the building for quite a long time."  Describing leaks in the production area, Miller said "in some of the areas it was standing water around the injection molding process."  Miller added that it had rained prior to the equipment auction and potential buyers had to navigate around puddles of water.  BOA's representative also testified that he saw a puddle of water inside the building in 2008.  The bankruptcy judge's findings in this regard were not clearly erroneous.

NPC contends that several findings regarding the assignment were outside the scope of the trial.  First, NPC argues it was error to find that Cheryl Miller was aware of the pre-assignment scrapping but preclude her from explaining why she was unable to inspect the interior prior to the assignment.  The bankruptcy judge expressed doubt that Miller was unaware of the condition of the building, but, whether or why she was unaware of the scrapping activities was immaterial because "it was reasonable for the bankruptcy court to infer that she acted as she did because the condition of the building was not important to her decision."  *New Prods.*, 577 B.R. at 284.  NPC represents that Miller would have testified that she was unable to inspect the building because she could not obtain the insurance required as a condition to access the building.  NPC does not explain how this evidence could have undermined the bankruptcy judge's inference.

Second, NPC challenges the bankruptcy judge's statement in a footnote that "it must have been clear to the Trustee, after the Assignment Date, that he could no longer count on cooperation from the holder of the principal secured claim against the Property." *New Prods.*, 543 B.R. at 826 n.9. The rest of the footnote makes clear, however, that this was nothing more than a comment on the timing of the Trustee's motion for approval of his final report. *Id.* ("From the various objections to the Trustee's proposals that New Products filed while it held only an unsecured claim, it must have been clear to the Trustee . . . ."). Nor has NPC articulated how this was either inaccurate or material to the bankruptcy court's judgment.

Third, attacking the bankruptcy judge's statement that BOA and NPC had taken a "cavalier approach to the building," NPC complains that the bifurcated trial prevented Miller from testifying that NPC had taken some steps to protect the building after it became a secured party. Miller did testify, over defendants' objection, about further looting and scrapping in the post-assignment period; but, she was not asked about any self-help efforts NPC undertook to try to prevent it. Nonetheless, Miller's testimony that NPC used its own security guards and installed new locks and a surveillance camera would not have undermined the bankruptcy judge's finding that NPC did not exercise its rights as a secured creditor.

*Opinion Testimony*. NPC offered an unconventional method for valuing the Property based on the opinion of Michael Frederick of Frederick Construction that the scrap value of the materials removed from the Debtor's facility "would be approximately $1.5-$2.0 million dollars." Defendants moved to exclude Fredrick's opinion for a number of reasons, including failure to comply with Fed. R. Civ. P. 26. The bankruptcy judge carefully analyzed the issues, recognized that Fredrick could be qualified as an expert, but warned that Fredrick would not be permitted to stray too far from his report. At trial, after voir dire and argument from counsel,

Frederick's opinion testimony was excluded both because he relied on matters not mentioned in his report and because his opinion was not "based on sufficient facts or data" to satisfy Fed. R. Evid. 702(b). *New Prods*., 543 B.R. at 823 n.7. The bankruptcy judge, as "gatekeeper," was required to determine whether the expert witness testimony "both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993). After review of the voir dire, we agree entirely with the district court that "Fredrick's opinion testimony was problematic in many respects" and was based on "questionable assumptions" and "a lack of concrete, reliable support for his estimate." 577 B.R. at 281.) The bankruptcy judge did not abuse his discretion by excluding Fredrick's opinion regarding the "scrap value" of the building.

*Not Fully Heard.* NPC argues that the bankruptcy court erred in granting judgment under Rule 52(c) because NPC did not have an opportunity to be "fully heard." NPC's argument is cast in terms of a lack of evidence regarding either the value of the land alone or under an "income approach." Reading past the argument headings, however, NPC's claim is that it was not "fully heard" on the issue of valuation because it did not have the opportunity to cross-examine two witnesses whose reports were admitted into evidence without objection but whom the defendants never called because their Rule 52(c) motion was granted. In this appeal, NPC does not acknowledge that it could have called either witness or objected to the admission of their reports without an opportunity to cross-examine them. The bankruptcy judge did not prevent NPC from doing so, and only entertained the defendants' motion after NPC had rested. This claim is without merit. *See EBC, Inc. v. Clark Bldg. Sys., Inc.*, 618 F.3d 253, 274 n.23 (3d Cir. 2010) (rejecting similar argument).

Finally, NPC asserts in a catch-all fashion that the bankruptcy court should have considered the "Offer of Proof" that it filed shortly after its motion for new trial or to alter or amend judgment. (Page ID # 3278.) The pleading purports to summarize evidence that NPC had not presented due to the bifurcation of issues and entry of judgment under Rule 52(c). The bankruptcy judge refused to strike that pleading, but expressly declined to consider it. The pleading sets out NPC's theory of the case, including describing evidence that was admitted at trial; but, NPC has offered no explanation on appeal (here or in the district court) of how consideration of this pleading could have altered the bankruptcy court's judgment. As such, this claim of error is deemed forfeited. *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("[I]ssues averted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." (citation omitted)).

## C.      Assignment of BOA's Pre-Petition Claims

The bankruptcy court granted in part the defendants' second motion for summary judgment, concluding that the assignment of "all the right, title and interest of [BOA] in, to and under the Loan Documents," did not include any "non-contract claims (including for breach of fiduciary duty) predating the Assignment." *New Prods. Corp. v. Tibble, et al. (In re Modern Plastics Corp.)*, 534 B.R. 723, 729 (Bankr. W.D. Mich. 2015) (summary judgment order); *see also New Prods. Corp. v. Tibble, et al. (In re Modern Plastics Corp.)*, 536 B.R. 783, 786-87 (Bankr. W.D. Mich. 2015) (denying reconsideration). NPC has not shown this was error, or that any error would be material in light of the bankruptcy judge's subsequent findings.

First, NPC argues that it succeeded to *all* of the rights of BOA because a mortgage assignee stands in the shoes of the mortgage assignor. *See Coventry Parkhomes Condo. Ass'n v. Fannie Mae*, 827 N.W.2d 379, 382 (Mich. Ct. App. 2012) (holding that lien held by assignee of

mortgage had the same priority as mortgagee).  It is certainly true that NPC was entitled to enforce the mortgage and notes, and stood in BOA's shoes with respect to the secured claim that had been filed in the bankruptcy proceeding.  NPC does not dispute, however, that an assignment is a contract to be interpreted in accordance with rules of contract construction under Michigan law.  *See Macomb Interceptor Drain Drainage Dist. v. Kilpatrick*, 896 F. Supp. 2d 650, 658-59 (E.D. Mich. 2012).  As the court in *Macomb Interceptor* explained, an assignment of the rights under a contract permits an assignee to assert claims or causes of action to enforce the contractually created rights, but it does not necessarily permit the assignee to bring distinct tort or statutory claims.  *Id*. at 660-61.

As noted earlier, § 2.1 of the Assignment provided that NPC purchased and BOA sold, assigned, and transferred to NPC "all the right, title and interest of [BOA] in, to and under the Loan Documents (except with respect to the Guaranties and the Guarantors)."  *New Prods.*, 534 B.R. at 726.  The "Loan Documents" were specifically defined to include only the security agreement (as amended), a promissory note, a mortgage and an assignment of rents, which the bankruptcy court recognized gave NPC the right to enforce contractual claims against the Debtor and its property.  *Id*.  In § 2.3 of the Assignment, NPC also acknowledged that BOA was "not assigning, transferring, or otherwise providing Assignee any rights in or to anything . . . other than the Loan and the documents and items specified on Exhibit A."  *Id*.  Without repeating the bankruptcy court's reasoning in full, we find no error in its conclusion that "the Bank assigned to New Products only the Bank's contractual rights against the Debtor, not its tort claims, if any, against Mr. Tibble."  *Id*.; *see also New Prods.*, 536 B.R. at 786-87.

**D.      Unsecured Creditor Claims**

Finally, NPC asserts that it should have been allowed to pursue a breach of fiduciary duty claim on behalf of the unsecured creditors despite the appointment of a successor trustee. The bankruptcy judge ruled during a pretrial conference that NPC did not have standing to do so, and confirmed that the successor trustee had decided not to pursue a claim against Tibble on behalf of the estate. NPC argued in its post-judgment motion (and in the district court) that it could have established derivative standing. The district court found, however, that NPC had not raised the issue prior to the entry of judgment or shown that it met the requirements for derivative standing. *New Prods.*, 577 B.R. at 277.

As the bankruptcy court explained, the successor trustee became "the representative of the estate and the person with standing to sue Mr. Tibble for any breach of duty he owed to the estate during his tenure. *See* 11 U.S.C. § 323; *see also* Fed. R. Bankr. P. 2012(b) and 6009." (Page ID # 160 n.3.) NPC has abandoned the issue of derivative standing on appeal and, changing course, now argues that it should have been allowed to proceed with a claim on behalf of the estate because this action was filed when Tibble was still the Chapter 7 Trustee. This argument is deemed forfeited, however, both because NPC offers no reasoned explanation for why that should be so, and because the argument is raised for the first time on appeal. *See In re Johnston*, 209 F.3d 611, 612 & n.1 (6th Cir. 2000) (citing *White v. Anchor Motor Freight, Inc.*, 899 F.2d 555, 559 (6th Cir. 1990)); *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997).

\*      \*      \*

The district court's order affirming the bankruptcy court's judgment on the merits is **AFFIRMED**.